## Gold v. Integrity Trust Company et al.

*Harry D. Gottlieb*, for plaintiff.

*S. B. Fortenbaugh, Shields, Clark, Brown & McCown, Carlos Berguido, Jr.,* and *Brown & Williams*, for defendants.

GORDON, JR., J., January 9, 1935.—This is a bill in equity brought to secure delivery by the defendant banks to the plaintiff of certain stock owned by her, and which she had loaned to a company of which her husband was secretary and treasurer, to be used as collateral by the company for a loan of $18,000

from the defendant banks. The bill avers that the loan was made under an agreement with the defendant banks that any payments received by them on account of any indebtedness which the company might owe to the banks would be applied first to the loan secured by the plaintiff's stock until the same was extinguished, when the plaintiff's stock would be returned to her. The bill, as originally filed and as amended at the bar of court, avers that the $18,000 loan was paid off by the receipt of payments of accounts receivable, which were subsequently assigned by the company to the banks as collateral for its general indebtedness to them, and also by a dividend in bankruptcy of more than $18,000 declared and paid to the banks upon the company's entire indebtedness to them at the time of its failure. There is little if any dispute upon the facts of the case, most of which were submitted to us in the agreed statement of facts filed at the trial, and the question raised for our decision is whether or not the receipt by the banks of the payment of accounts receivable, referred to above, and of the dividend in bankruptcy, constitutes, under the banks' agreement with the plaintiff, an extinguishment of the loan secured by her stock, so as to entitle her to a decree directing the return of it to her.

### Discussion

The foregoing facts raise two questions, either of which, if answered in the affirmative, will require the granting of the relief prayed for. The plaintiff is the wife of the secretary and treasurer of Walters Furniture & Carpet Company, which was a large borrower from the defendant banks, and which, on March 23, 1932, being then indebted to them in the sum of approximately $250,000, desired to increase its indebtedness by $18,000. The banks required additional security for this loan, and the company therefore, through its secretary and treasurer, induced the plaintiff to lend to it 97 shares of Glick Furniture Company stock, which were her private property, to be used as collateral for the additional loan. The loan was made, and the stock was deposited as collateral, under an agreement with the banks by the terms of which any moneys which the banks might thereafter receive from the company in payment of any of its indebtedness to them would first be applied to the $18,000 loan secured by the plaintiff's stock, until that loan was extinguished, when the plaintiff's collateral would be returned to her.

Subsequently the company, by agreement between itself and the banks, to which the plaintiff was not a party and of which she had neither actual nor constructive notice, assigned its accounts receivable to the banks as further and general collateral for all its present and future indebtednesses to them. From time to time thereafter, the banks received payments of the accounts receivable to the extent of more than $18,000, and, by the agreement just referred to, these funds were handled in the following manner: The banks carried the company's indebtedness on their books in two accounts, one containing the $18,000 loan secured by the plaintiff's stock, and the other containing all the rest of the company's indebtedness (which for convenience we may refer to as the general loan account). When payments of the assigned accounts were received by the banks, they were credited on the general loan account of the company and were then reloaned to the company by the banks by depositing the money so received in the checking account of the company, taking a new note from it for a like sum, and charging the general loan account with the amount thereof. Thus, in the same transaction, the general loan account was reduced by a given amount and immediately increased by the same

amount, the total indebtedness of the company remaining the same after as before the transaction. None of the collections of assigned accounts was credited on the $18,000 loan secured by the plaintiff's stock.

This raises the first of the two questions referred to as being controlling of the plaintiff's right to a return of her collateral; namely, whether, under the circumstances, these collections, aggregating more than the loan secured by the plaintiff's stock, should, under her agreement with the banks, have been credited on that loan so as to constitute a discharge of it and entitle her to a return of the collateral. Considering this question, it is evident that the elaborate procedure followed by the banks of collecting the assigned accounts, crediting them on the loan, and then relending them to the company, must have been adopted for a definite purpose. It was unnecessary to go through this cumbersome process unless some object was to be subserved by doing so. By simply permitting the company to retain and deposit in its own account the proceeds of the collection of bills, the same ultimate result would have followed. Their purpose in pursuing the method adopted is obvious. An assignment of collateral for a past debt would have been valueless in the event of bankruptcy, which was hanging over the company at the time, and which finally followed. By creating a new debt, however, for each account collected and reloaned to the company, the assignment of the accounts receivable became pro tanto valuable to the banks as collateral in the event of bankruptcy. Hence, it must have been the purpose and intention of the parties, in doing what they did, actually and in truth to pay off and reduce the loan as the accounts were collected, and to create a new loan secured by adequate collateral. This being so, the transaction was in fact and in law an actual payment by the company on account of its indebtedness and the creation of an entirely new debt to the banks. The banks and the company either acted in the matter in good faith or were attempting to perpetrate a fraud upon other creditors, and they will not be heard to say now, when the right of the banks to the collateral of the plaintiff is in question, that the transaction was not what it was made to appear to be but was a mere subterfuge and a fraud. They must stand or fall upon the realities of what they did and intended, by which alone the plaintiff's right can be justly determined. For these reasons, we are of opinion that, when the banks credited payments of the assigned accounts on the general loan account of the company, they violated their agreement with the plaintiff to apply all payments on account of company indebtedness first to the $18,000 loan, and that, such receipts being in excess of the amount of that loan, the plaintiff's collateral was released thereby, and should be returned to her.

The second question presented for our determination is raised by different facts. The company having ultimately failed, a dividend in bankruptcy of something more than $18,000 was paid to the banks on the company's total indebtedness to them; and the question raised is whether, under their agreement with the plaintiff, the banks must credit the entire dividend in reduction and extinguishment of the $18,000 loan, so as to release the plaintiff's collateral, or whether they may credit to it only that proportion of the dividend which the loan bears to the total indebtedness upon which the dividend was paid. If the former, the loan is discharged, regardless of the payments of the assigned accounts, and the collateral is released; if the latter, the loan is only reduced by the proportion of the dividend applicable to it.

Upon this question, we are of opinion that as much of the bankruptcy dividend as may be necessary to extinguish the $18,000 loan and release the plaintiff's collateral must be used first for that purpose. Her agreement with the banks was that any receipts on account of any company indebtedness should be

first applied to the loan secured by her stock. This agreement was not limited to receipts during the continuance and operation of the company. So to construe it would read into it a limitation which it does not contain. Qua the plaintiff, the company's loans were a single indebtedness including the $18,000 loan, and the dividend was a single dividend on the one debt. The agreement allocated the first payments to the loan secured by her stock, and both justice and equity require the bankruptcy dividend to be so applied. The loan was therefore liquidated by the dividend, regardless of any receipts of money from the assigned accounts.

For the foregoing reasons, we are of opinion that the plaintiff is entitled to maintain the bill in equity filed by her and to a decree directing the return to her of the stock deposited as collateral for the loan in question.

### Decree

And now, to wit, January 9, 1935, this cause having come on to be heard upon bill, answer, and proofs, it is ordered, adjudged, and decreed:

1. That the defendants, Integrity Trust Company and Central-Penn National Bank, and each of them, be, and they are, hereby required forthwith to deliver over to the plaintiff, free and clear of any lien or claims by the said defendants, the 97 shares of stock of Glick Furniture Company heretofore deposited with them by the plaintiff as collateral for the loan of $18,000 from the said defendants to Walters Furniture & Carpet Company, as evidenced by the promissory note of said company dated March 28, 1932.

2. That the defendants pay the costs of this proceeding.

The prothonotary will enter this decree nisi and give notice thereof to the parties, or their counsel, and, unless exceptions thereto are filed within 10 days, either party may present a form of final decree to be entered in the case.